Thank you, Your Honor. Richard Schwartz for Pebble Limited Partnership, and what I'd like to address today at the start is the two prongs of the finality test established in Bennett v. Speer. And the first prong is consummation. With respect to consummation, the starting point is our complaint. And our complaint has two claims, and the only two claims in the complaint challenge only jurisdiction. Those are the only issues in the case. The issue we're challenging is not a tentative decision, because the EPA's decision to implement the proceeding, to start the proceeding, has already happened. It's an ongoing proceeding, and there's no hint from the agency, even in the briefs, that it's actually going to reconsider that decision. But that's just a decision to decide something. Well, it's a decision that they have jurisdiction, and it is true that other activities will follow from this, but that does not prevent this decision from being a final one. Do you have any decision from any court ever holding that a decision to exercise jurisdiction in a case is a final decision? Well, the cases that have held that include Atlantic Richfield in the D.C. Circuit, the Menard Run case, which, although not jurisdictional, clearly was an interim step, Ciba-Geigy, where there was an interim procedural decision that was found to be final, and I'm trying to think. There may be some others cited in our brief. How do you distinguish a case such as FTC versus Standard Oil? Oh, because in that case, the decision that was challenged was going to be completely revisited during the administrative proceeding. It was simply a decision that's... Sure, but the jurisdiction here can be revisited at the end of the proceeding. But it won't be considered during the proceeding, and that's the difference. The difference is that there's no advantage to waiting, because unlike FTC versus Standard Oil... for an interlocutory appeal. We don't have that kind of a process available to an administrative agency. I don't understand why that makes this final. Because the case law talks about finality in terms of two things, whether the decision is the agency's last word on the subject, which is true here but was not true in FTC versus Standard Oil, and was not true in the San Diego case, both of which involved administrative proceedings where the agency was going to address exactly the issue that the plaintiffs tried to bring up to the courts. Here we have an unusual situation. The APA doesn't... Section 704 doesn't speak of finality. It says, I think it makes available for challenge a final agency action. Final agency action. That's right. So what's the action here? The action was the application of a decision and interpretation of law. An interpretation of law is an action for the purposes of administrative law. Sure, but this is all very existential. It's just a decision to decide. They haven't done anything yet. Your client's not on the hook for anything. No decision's been made. The decision may favor your client. Yeah, well, they've done quite a bit, and we don't know what the decision will do to the client, but the things that they have done are really two things. First, they stripped the core of its ability to issue a permit because EPA now has taken over, and the second thing they've done is commenced an administrative process that we believe is unlawful. And there are a number of courts, including the Supreme Court, that have said that that's the kind of hardship that you do consider when you're doing these sorts of making these sorts of judgments about whether... What Supreme Court case would support you? Pacific Gas and Electric was the case, and it was cited in Northeast Hub, and this circuit has also found the same thing in the sales case, sales hydro as opposed to S-A-L-E-S. And in that case, this circuit held that the process itself created enough of a hardship to make the case justiciable. How about our decision in Fairbanks? Fairbanks presents a different situation because in Fairbanks, this court found, and by the way, I think it will have to be reconciled with Sackett. No, I'd like to hear your view on that because I guess I read Fairbanks as pretty much controlling the outcome here unless Sackett had basically abrogated it. Okay, so there's two. I'll address both points. One is the reason it doesn't control the outcome here is because in Fairbanks, the operative concept was that the Corps of Engineers had left the world as it found it. In other words, it didn't change any of the choices that were confronting the borough of Fairbanks. Here, in contrast, we've got a new, we're confronted with the agency going on the offense, which was not true of the Corps of Engineers in Fairbanks. Here, the agency's gone on the offense, and it started a proceeding, an offensive proceeding to veto the permit that we might like to get someday. Didn't it decide in 1979 that it could do that? Yes, it did, but it hadn't been applied to us until this past year. And this court's decision in Wind River said that when you have an application of a regulation, that that restarts the clock. And so that's the reason for jurisdiction here. But then to answer the rest of your question. Well, before you get to Sackett, I'm not following your attempted distinction of Fairbanks. It seems to me here that the decision you want to challenge, right, the decision that the EPA thinks it has jurisdiction, essentially, to go through this proceeding before a permit application is filed. It seems to me it's exactly analogous to the jurisdictional determination that was at issue in Fairbanks. So maybe try to run through that again, because I definitely was not persuaded by your first response on that point. Okay. In Fairbanks, what the court was saying was, the question was, was the impact enough? In other words, in Fairbanks, they found it was the consummation. Right. So that was exactly the same. Yeah. And I think that's the same here. Yeah. And so the question was the consequences. Right. And in Fairbanks, essentially what they said is there's no consequences, because all they did is tell you what they think, but your choices are the same. You can apply for a permit. You cannot apply for a permit. You can bill without a permit. So that's all the same. Same for you, right? Well, what's different is that we've got this veto proceeding. We have no choice about the veto proceeding. It gives us two bad choices. We could try to submit a permit application before we're ready, which is really no good for anybody. Right. Or we can participate in this proceeding and try to hope that we don't get a veto that will be harmful. But the point is that we have to do something. In other words, we now have to participate in a proceeding which we believe is illegal. You don't have to participate. Well, no, we don't. We don't have to participate. We get our permit vetoed, or we could get the equivalent of it vetoed. But the consequence of that is just like in SACIT, for example. SACIT was involved in an administrative consent order, and the critical thing about an administrative consent order is that it has no operative effect on its own, at all, actually. It's not self-executing. The only way you can enforce it is for the agency to go to court and get a court order. And you don't know whether they're going to do it. And, in fact, the administrative consent order in SACIT said on its face that the SACITs were invited to come in and to discuss the terms and requirements of the order. And so on its face, it was, in that sense, it was an interim decision that the agency could change. It could decide not to go to court to enforce. And so, you know, all of those. Although it's pretty different once you look at SACIT to see that the agency effectively told them, we're going to enforce this. That's why that was the whole purpose of sending them the letter. Yeah, that was what, in the same letter where they said we're going to enforce this, they also said come in and see us and talk to us. And that decision was subject to change. In fact, the SACIT court pointed out that the fact that it could be revised, which the court recognized, was not in and of itself something that made a final agency decision unfinal. If these people had tried to sell the property, for example, they would have had to have disclosed what is effectively an EPA encumbrance on the property that clearly diminished the value of the property. It clearly had legal consequences for them. Well, it had practical consequences. And the veto proceeding has those for us as well. Well, it has practical consequences, but you don't know what the end of the proceeding is. You don't know what the end game is here yet. EPA told them what the end game was. In SACIT, they didn't know what the end game was. In sales, they didn't know what the end game was. In Menard Run, they didn't. In all these cases, including the preemption cases, including Northeast Hub, they talked about the fact that they didn't know what the end game was. But nonetheless, in the instance where you're challenging jurisdiction, which is what we are doing, the mere fact of going through the agency proceeding is, in fact, sufficient to make a case justiciable. And now, in order to give time to my colleague, Mr. Fortier, as much as I enjoy talking to you, I need to let him take over. May it please the Court. Sam Fortier for Alaska Peninsula Corporation. Alaska Peninsula Corporation shareholders are the ancestors who were the wise stewards of the lands that have been conveyed to Alaska Peninsula Corporation with the promise of economic justice pursuant to the Alaska Native Claims Settlement Act 44 years ago. The descendants of those ancestors live in five small villages in Bristol Bay, two of which are adjacent to the Pebble Mine. And those villages are shrinking. Schools are closed in two of the five villages because there's no employment, because the fishery is no longer providing a sustainable economy. APC would be at the very head of a mine, opposing a mine, if it, in fact, posed a danger to the land and the people and the ancient culture. But there's no mine, and there's no permit. There's only a fear of the unknown, of the untested. But that's not rational. Now, so what's the practical effect of EPA stepping in at this point? I mean, it sounds like a sequencing problem. That is, if Pebble had applied for the permit, EPA clearly would have had the right and nobody would be disputing their jurisdiction to come in and tell the court, if the permit had been issued, that they were withdrawing the land from specification. So what's – I mean, it may be out of order in terms of the way that you would like things to do, but EPA clearly has a right to step in at some point in a long proceeding. What's the problem with doing it now? Judge, frankly, the problem with doing it now is it upsets the balance of Section 404 of the Clean Water Act, which is set up exactly for the purpose of allowing vetting of an application. What we're dealing with now, the problem now is that the decision is being made on a fictitious mine, something that never existed before and may never exist anyway, that has the effect of vetoing what may actually be a vetted, properly made application that's anticipated under the Act itself. What EPA has done with this, in other words, is to take away the congressional purpose of Section 404 and substitute in its place the omnipotent power of the EPA. And with that, I reserve the rest of the time to thank you very much. Thank you. May it please the Court, I am David Shilton, representing the U.S. Environmental Protection Agency, and I'd like to start by talking about the two Bennett tests for final agency action. The consummation test first, and a question was raised about the Fairbanks case. I think the Fairbanks case, it found a jurisdictional determination that the Corps makes is the consummation of an agency process because the Corps, in that case, applies its view of the law to a set of facts and comes up with a determination that this piece of property is waters of the United States. We don't have that here. The February 2014 letter from EPA doesn't make any determination, certainly doesn't make a determination on the question that Pebble once reviewed, which is EPA's authority to initiate this proceeding now. Because that determination was made back in 1979, right? It was made in 1979, and the regional administrator would not have authority to do anything. Right. It seems to me that decision has been made. I can't think of how it would be any more final than it is now. I mean, the only way it could be changed, I assume, is if EPA went through a whole notice and comment process. That's correct. But that fact doesn't make the February letter the consummation of an agency process. It starts an agency process, which is about whether mining this deposit would have unacceptable adverse effects. But it doesn't do anything about EPA's jurisdiction. Now, at the end of the day, when EPA makes a final determination and there's a final agency action, and that can be challenged and all of the questions can be raised, including EPA's authority. But it can't be raised at the beginning of the process because it's just not a final agency action. And so that's how it differs, I think, from Fairbanks. And certainly it differs on the question of legal consequence. I mean, well, I think Fairbanks is on all fours. A jurisdictional determination, the city of Fairbanks argued, casts a shadow on our property. We have to go through this administrative maze. And the court said, no, that's not a legal consequence for purpose of the test. And the same is true here with Pebble. It doesn't even have to participate in this proceeding if it doesn't want to. It can participate. But there's no legal consequences of this. But there is. It's just that you're saying that it's too speculative at this point because it's going to take years for any permit application that they may file to get processed. But there is a legal consequence of the decision the EPA has made, and that's that the Corps could not issue a permit. It seems to me that's – I don't know how – There's only a possible hypothetical consequence. And there's been no permit application. The Corps couldn't act today because there's no application before it. It's not caused by anything EPA has done. Now, even if we get to a point where Pebble, if it is able to submit an application to the Corps, the Corps could process it. And if the Corps got to a point where it was ready to act on the permit, which it could only do after doing all the NEPA work, and if this 404C proceeding was still pending, which is rather hard to believe, but if we engage in all that conjecture, all it means is an administrative delay. Is it still pending now? You all still have not – or not you all, but the EPA still has not finished this proceeding? It is not because it has been preliminarily enjoined. And that's still in effect? At the request of Pebble. Okay, that's what I thought. All right. And Section 404C proceedings generally can move fairly expeditiously. The regulations lay out timelines, and I think we all agree in this case that an actual permit application before the Corps would be a lengthy proceeding for a proposal like this. What about the sentence in Sackett that I assume your opponent is going to point to on rebuttal, where the Court did seem to say that maybe even standing alone, just the fact that an EPA action could make it more difficult for a landowner to get a permit might be enough. Well, the Court listed a series of legal consequences, and that was just one of the series. A compliance order says you have to do – you have to remove that rock and soil from your property. It's a requirement. The compliance order indicates that you are potentially subject to double penalties if you don't comply. It's a very serious legal step. And the Court also mentioned that if you do have a compliance order against you, there is a substantive presumption that any permit application would be harder to get. Here, we don't have any – Pebble is not obliged to do anything like Sackett was. And the consequence is simply a possible administrative delay if we have a situation where there's a permit application, the Court processes it and is ready to move on it, but the EPA 404 proceeding is still going on. That's totally different, I think, than the Sackett situation where there was the compliance order. So, you know, in summary, I think the cases that Pebble has brought up this morning are older cases from other jurisdictions that didn't consider the two-part Bennett test. I think this Court's cases, the Fairbanks case, the City of San Diego case, which is very close on point because it also involves a letter from a regional administrator, which, in fact, the letter in that case set out EPA's legal position that the Ocean Pollution Reduction Act applied to the city's grant. But it initiated a proceeding to actually apply that, and the Court found that it was not final agency action despite the fact that it had said, here's EPA's position on the law. So the mere fact that an initial beginning of a proceeding may state the agency's view on some legal point doesn't give a person the right to get review right then because that would lead to piecemeal review. You would have challenges at the beginning of any proceeding attacking the agency's assumptions about its authority, and then at the end you would have other challenges. And here Pebble has a whole series of complaints about what EPA is doing here.  With regard to the timing of this action, Pebble says, as a matter of policy, it would be better to wait until we have an application on file and so forth. So what it's proposing is that it can get one of those questions answered at the very beginning, that is EPA's authority under the Act, and get the others answered at the end and then review that too. And it's that sort of piecemeal review that the Supreme Court in the Federal Trade Commission versus Standard Oil said, you know, Congress has just decided not to allow that. That's why we have the APA final agency action requirement. Well, the court in that case, though, sectioned toward the very end of the opinion, addressed the application of the collateral order doctrine. I know the petitioner here hasn't raised that doctrine, but it seems to me it would apply here much more readily than it would have in Standard Oil. And I'm just curious what your position is on that. Well, you know, this court's decisions under the APA have not ever, to my knowledge, applied a collateral order exception doctrine. But I think if you were to apply that here, again, you would be inviting piecemeal review in all sorts of cases. Well, but, I mean, from Pebble's standpoint, though, maybe you can help me work through this. I mean, if they're forced to wait until the EPA finishes this whole 404C proceeding, the harm that they're trying to avoid, it seems to me there's no way to remedy it at the end of the day, right? They're saying basically that we're going to lose our investors. We might not even be able to, you know, muster the capital to put forward a permit application if we're forced to endure all of the uncertainty that this proceeding is inflicting upon us. Telling them, well, just wait until it's all over and then seek review, it seems to me you're telling them you don't have a remedy for the harm you're complaining about. Well, that sort of harm is the harm that the Supreme Court considered in FTC versus Standard Oil. No company wants to have to go through a whole proceeding where the agency has alleged that it's violating some statute. And the company would like to get that sort of question resolved at the beginning so it doesn't have to go through it. And the Supreme Court said no. Congress has said you just have to put up with that. No, but in the context of the collateral order doctrine, what the court there said was that the issue, whether I think it was, what was it, whether the commission had reason to believe that the defendants were violating the law, it was too bound up with the merits, the ultimate merits determination for the collateral order doctrine to apply. And that's why I was saying I understood why the court reached that decision there. But here it seems to me the jurisdictional issue that they want to challenge is totally separate from the ultimate merits determination that the EPA is ultimately going to make, isn't it? Well, they argue a number of reasons for EPA not processing this now before there is a permit. One of them is the jurisdictional question, but they also say that under NEPA you should wait until there's an action and an actual proposal. So I think it is bound up with these other policy questions they have raised. But this court's cases I don't think have contemplated there being a collateral order type exception in these cases. There's just no authority for that in the circuit or elsewhere to my knowledge. So I don't think that the collateral order exception helps you here. Well, that's what I would have thought, but that's why I was surprised to see the Supreme Court addressing that argument on the merits. The court certainly didn't say, well, wait a minute, this is an administrative agency action context. This collateral order doctrine can't apply. It actually just went through the analysis just like it would if we had a case coming out of the district court. I think the Supreme Court's later decisions on final agency action like Bennett have focused simply on the two-part test and have not suggested that there's a collateral order test. So the settle rule now seems to be you have to show consummation in the agency process and legal consequences, and I think that Pebla has not showed either one of those here. Unless there are other questions. I think so. Thank you, Mr. Schultz. Mr. Schwartz, you have some time remaining. In looking at Bennett, whether something is pre-Bennett or post, Bennett simply relied upon established precedent and applied it. And if it did anything, it may have expanded the openness of the courts because you had kind of a chain of events where you had a biological opinion, which had a coercive effect in the Bureau of Reclamation, which then would perhaps change the way the Klamath irrigation project was run, which would then affect the plaintiffs, who were the ranchers at the other end. And so Bennett, if anything, was an expansive finality decision. And what it talks about is the change in the legal regime that was affected. And in Bennett, we didn't know what was going to happen for sure at the end of the chain. In Sackett, we don't know for sure what would have happened at the end of the chain because it was an administrative compliance order that may not have been enforced. If it was enforced, it would be enforced by an independent agency, which is the court. And so the fact that there are contingent events doesn't prevent something from being final. The point that's kind of interesting about the impact of the legal proceeding and the change in the legal regime that it affects is that this action actually changes the subject of the proceeding. The subject of the proceeding is not someone's application. The subject is a project that EPA has made up so it could veto it. I mean, that was the purpose of EPA constructing kind of a mine. And so this is really the ultimate straw man. They constructed it so they could knock it down. And when they did that, they changed what should be the nature of a veto proceeding. The whole purpose was to stop the court from issuing a permit improvidently. And so EPA was given kind of backstop authority to prevent the environment from being harmed from the court making a mistake. Here you've switched everything around, and EPA is preemptively saying, we're going to come up with a veto of a project that we're going to make up, and that court is going to stop you from acting. And that's why it's different. I'm sorry. Well, the one question I guess I have about the harm that your client is complaining of now, I mean, some of it seems self-inflicted in a way because we would have expected the EPA to basically have finished this 404C proceeding a long time ago, but for, I guess, this other legal challenge that your client has brought. You can get review of this issue once that final decision is made, right? Nobody is disputing that. And it seems like, you know, I understand the uncertainty that's causing a lot of problems for your client, but, boy, you could have kind of skirted all of this in a much more expeditious way if you just let the EPA finish the job, right? Yeah, well, the issue is, you know, could we have filed a permit application sooner? No, I'm not talking about that. I'm talking about just letting the EPA issue its final decision. I mean, there are pretty tight timelines on when the EPA administrator ultimately has to say yea or nay, right? Well, it's interesting because the way it turns out is not what any of us envisioned. As a practical matter, there are two things. One is when they reverse the process, they're changing the entire nature of that legal regime. In other words, it's a different permitting process because whatever comes afterwards will be inevitably affected by what EPA did. And so in that sense, there's nothing we can do about that. In terms of whether it would have worked out better is not really knowable. And so the cases that deal with final agency action look at the state of play, and when there's at the time that the case is filed, and in the case of a challenge to jurisdiction like the preemption cases and some of the cases I mentioned to Judge Bybee a few minutes ago, in all those instances how it was going to turn out was unknown because they hadn't finished. But in all those instances, the courts, including this court, said that because the agency was putatively acting beyond its jurisdiction, that's something we're going to find out now. And it's interesting because you mentioned that if this case, if this had started in district court and there were an issue about jurisdiction, the court would not make a decision on the merits until it decided jurisdiction. And so the normal order of things is you would decide jurisdiction first, and then you'd look at everything else after you determined that you did have jurisdiction. Here it's because of the way the agency process is set up, it's being reversed. But in this kind of case, this circuit, as well as others, have found that, yes, we will look at jurisdiction first when there's an assertion that, well, two things. There's an assertion that the agency is acting extra statutorily. And the second, which is true, very true here, is that it won't otherwise be considered during the agency proceeding itself, which is what distinguishes Standard Oil, what distinguishes the City of San Diego, where the agency explicitly said, yes, we will consider this during the agency proceeding. Here they can't. They can't do it because they've already got a rule and they'd have to do a new rulemaking. And the second is it's not even germane to the issues that are before EPA, which is only the environmental effects, not jurisdiction. And so there's no way to bring it up. Counsel, you're well over your time. Yes, I'm sorry. But thank you very much for indulging me. Thank you. We thank counsel for the argument. The case is submitted.
judges: Canby, Bybee, Watford